UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIRST NATIONAL BANK OF
NORTHERN CALIFORNIA,

    Plaintiff,

    v.

ST. PAUL MERCURY INSURANCE
COMPANY, et al.,

    Defendants.
_____/

No. C 11-6631 PJH

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT**

The parties' cross-motions for partial summary judgment came on for hearing before this court on October 31, 2012. Plaintiff appeared by its counsel Marci Reichbach, and defendants appeared by their counsel David DiBiase. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby DENIES plaintiff's motion and GRANTS defendant's motion.

## BACKGROUND

On October 31, 2008, defendant St. Paul Mercury Insurance Company ("St. Paul"), which is part of Travelers Companies, Inc. ("Travelers"), issued a financial institution bond (Bond No. 0494PB0735, or "the Bond") to plaintiff First National Bank of Northern California ("First National" or "the Bank"), effective beginning October 31, 2008 to the date of cancellation or termination.

The Bond was in effect at the time of the events that led to the filing of this lawsuit, and provided coverage for loss directly resulting from fraudulent voice or facsimile instructions to transfer funds. Under the Bond, First National was entitled to be indemnified for any single loss up to $5,000,000, with a single loss deductible of $100,000.

Brent Edwards and Paula Edwards ("the Edwardses"), trustees for the Edwards Living Trust, opened the Edwards Living Trust account with First National on June 8, 2009 ("the Trust account"). Currently retired, the Edwardses formerly operated a large family dry cleaning/laundry business. Over the years, they had numerous accounts with First National.

When they opened the Trust account, the Edwardses received a Deposit Account Agreement and Disclosure ("the Agreement"). The Edwardses signed a signature card in which they "agree[d] to the terms of" and "acknowledge[d] receipt of, a completed copy of this agreement, the accompanying terms and conditions, and policy disclosures."

Among other things, the Agreement includes the following provision: "With respect to wire transfers or other transfers of funds not governed by the Electronic Funds Transfer Act, [the account holder agrees] to enter into and comply with [First National's] wire transfer (if applicable) agreement and to comply with [First National's] security procedures." First National's security procedures ("the Security Procedures") were set forth in its Operations Manual. Two versions of the Security Procedures are in evidence – one that was in effect when the Trust account was opened, and one that was in effect starting March 1, 2010. Copies of these procedures were not provided to account-holders, although First National claims the procedures were "easily available" to the Edwardses.

The Security Procedures purportedly authorized First National to rely on voice and facsimile instructions to make wire transfers from the Trust account. The version that was in effect at the time the account was opened states that there are two methods of verification – (a) there is a "Wire Transfer Agreement" on file, and the customer provides his or her user ID number; or (b) there is no Wire Transfer Agreement on file, and the customer is either "known by voice recognition" or identified by "any of the following

methods" – user ID number, hint/password, government issued ID, date of birth, or Social Security number.

The version that was in effect in October 2010 states that wire transfer requests that have a Wire Transfer Agreement on file will be accepted by either written instruction submitted by fax or in person, over the phone, or online, but that phone requests will be accepted only "under emergency circumstances when a wire transfer agreement is not on file." If there is a Wire Transfer Agreement on file, the customer must provide his/her call-back user ID number. If there is no Wire Transfer Agreement on file, the following methods can be used – customer signature verified, or identified by a branch officer by voice recognition, or hint/password on account, or date and amount of last deposit and branch location where account is held.

On October 13, 2010, First National received a phone call from someone purporting to be Brent Edwards, requesting a wire transfer of $412,876.18 from the Trust account to a bank in Bangkok, Thailand. First National claims that the employee who took the call asked for verification information (date and amount of last deposit and the branch location of the account), which the caller provided.[1] First National then processed and completed the wire transfer to the bank in Thailand.

On October 14, 2010, there was a repeat request by telephone – this time for a transfer of $98,876.13, to a bank in Shanghai, China. First National again completed the wire transfer (after asking for and receiving the same type of verification information), to the Chinese bank.

On October 19, 2010, Mr. Edwards contacted First National to advise that he had not authorized the wire transfers. The South San Francisco Police Department and the Federal Bureau of Investigation then commenced an investigation, which first focused on the Edwardses, but which eventually uncovered a sophisticated criminal operation involving

---

[1] The employee who took the call, Amy Bhullar, stated that she verified the identity of the caller by name, account number, password, social security number, and mother's maiden name.

3

a pattern of fraudulent wire transfers from banks across the United States to banks in Europe and Asia.

The Edwardses demanded reimbursement from First National of the funds transferred from the Trust account. On February 16, 2011, First National entered into a settlement agreement with the Edwardses ("the Settlement Agreement"), pursuant to which First National agreed to pay the Edwardses the sum of $514,193.00, which included the total amount transferred ($511,752.31) plus interest and service charges.

On April 16, 2011, First National submitted a Proof of Loss to St. Paul (or Travelers), with documentation to support its claim under the Bond arising from the fraudulent wire transfers. First National asserts that the claim is covered by the provision in the Bond's Insuring Clause D – "Forgery, Alteration, and Fraudulent Instructions," under "Coverage D2 – Telefacsimile and Voice Instruction Transactions" (referred to as "the Fraudulent Instructions Insuring Clause").

The Fraudulent Instructions Insuring Clause provides that First National will be indemnified for losses if it "suffers a loss directly from . . . having in good faith . . . transferred funds on deposit in a Customer's account in reliance upon a fraudulent telephonic voice instruction" transmitted to First National "which purports to be from . . . [among others] an individual person who is a Customer of" First National.

"Customer" is defined for purposes of the Fraudulent Instructions Insuring Clause as "an entity or natural person" that

    (i)    has a Written agreement with the Insured authorizing the Insured to rely on telephonic voice or Telefacsimile Device instructions to make transfers;

    (ii)    has provided the Insured with the names of persons authorized to initiate such transfers; and

    (iii)    with whom the Insured has established an instruction verification procedure other than voice recognition.

The Bank must meet all three conditions for coverage to apply.

On October 17, 2011, First National received a letter from Travelers, in which Travelers acknowledged receiving the Proof of Loss, but denied coverage because the

4

Bank had not established that the Edwardses were "Customers" under the Bond, as it had not produced a "Written agreement authorizing [First National] to rely on telephonic voice or Telefacsimile Device instructions to make transfers."

On November 14, 2011, counsel for First National responded to the October 17, 2011 letter, stating that First National was "entitled to coverage under the Bond because Travelers cannot meet its burden to prove that Coverage D2 is inapplicable to this claim[,]" and that "Travelers' denial of coverage is not supported by the facts applicable to [First National's] claim, and accordingly is not made in good faith." Specifically, First National asserted that the documents presented with the Proof of Loss showed that the Bond requirement had in fact been satisfied.

First National filed the present complaint a few weeks later, on December 23, 2011, alleging causes of action for breach of contract and breach of the implied covenant, based on St. Paul's denial of the claim. Each side now seeks summary judgment as to the first cause of action for breach of contract.

**DISCUSSION**

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively

demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 324-25. If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson, 477 U.S. at 250; see also Fed. R. Civ. P. 56(c), (e).

B.  The Parties' Motions

First National argues that it is entitled to summary judgment on the breach of contract claim because there was a contract (the Bond agreement); First National performed all its obligations under the contract, including paying premiums and providing a timely notification of its loss; St. Paul breached the contract by failing to indemnify First National; and First National has been damaged in the amount of $514,193.

First National argues that the Edwardses were "Customers" under the definition in the Bond's Fraudulent Instructions Insuring Clause, because they opened the Trust account by signing the Signature Card, which indicated their intent to acquiesce to the terms of the Agreement; and because the Agreement required them to agree to enter into and comply with the wire transfer agreement and to comply with the Bank's Security Procedures.

First National contends that the terms of the Security Procedures pertaining to wire transfers permitted it to rely on telephone voice of facsimile instructions and to verify a caller's identity by one of several alternative means, including asking the caller to verify the date and amount of the last deposit and the branch where the account was held. First National contends that it complied with this verification requirement, on both occasions (October 13 and October 14, 2010) when it received telephone requests to transfer funds from the account.

St. Paul also seeks summary judgment on the breach of contract claim, arguing that

First National has not met the Bond's conditions for coverage, in that the Edwardses do not qualify as "Customers" under the three requirements of the Bond's Fraudulent Instructions Insuring Clause, and that its denial of the claim was therefore proper. St. Paul asserts that there is no evidence of a "Written agreement" with First National authorizing First National to rely on telephonic voice or fax instructions to make transfers, no evidence that the Edwardses provided First National with the "names of persons authorized to initiate such transfers," and no evidence that First National "established an instruction verification procedure other than voice recognition" with the Edwardses.

The court finds that First National's motion must be DENIED, and that St. Paul's motion must be GRANTED. For the reasons argued by St. Paul, First National has not established that the Edwardses were "Customers" under the definition in the Bond. A contract may validly include provisions of a document not physically part of the basic contract, so long as any incorporation by reference is "clear and unequivocal" and is "called to the attention of the other party" and the other party consents, and the terms of the incorporated document are "known or easily available to the contracting parties." See Shaw v. Regents of Univ. of Calif., 58 Cal. App. 4th 44, 54 (1997).

In this case, however, a generic signature card, read with an account agreement and a section from a bank's Operations Manual, does not constitute a "Written agreement" under the definition in the Bond agreement. Further, as an "agreement," it is indefinite as it is not accompanied by any draft of the wire transfer agreement or any document setting forth the provisions of such an agreement, and is nothing more than an agreement to agree, which is not enforceable under California law. See First Nat'l Mortg. Co. v. Federal Realty Inv. Trust, 631 F.3d 1058, 1065 (9th Cir. 2011); Banco Do Brasil S.A. v. Latian, Inc., 234 Cal. App. 3d 973, 1016 (1991); Kruse v. Bank of America, 202 Cal. App. 3d 38, 59 (1988). In particular, the Security Procedures cannot be considered part of a written agreement as they were not provided to the Edwardses, and were not even described sufficiently to enable the Edwardses to determine where they were located and what they say. Thus, there cannot have been any meeting of the minds.

In addition, First National has not established that the Edwardses provided it with "the names of persons authorized to initiate such transfers," nor is there any evidence showing that the Edwardses authorized voice-initiated funds transfers. The Signature Card signed by the Edwardses when they opened the account states as follows:

> The undersigned agree to the terms of, and acknowledge receipt of, a completed copy of this agreement, the accompanying terms and conditions, and policy disclosure(s) they have received today. The undersigned further authorize the financial institution to verify credit and employment history and/or have a draft credit reporting agency prepare a credit report on the undersigned, as individuals. The ownership type and beneficiary designation specified on this document will remain the same for all accounts listed on this document.

The Signature Card cannot be interpreted as a "written agreement" that authorized all types of withdrawals from the account, including wire transfers solely on voice authorization. Indeed, the words "voice," "verbal," and "telephonic" do not appear on the Signature Card. There are no other provisions setting forth any account terms. Moreover, the Signature Card does not refer to an "Account Agreement" or a "Deposit Account Agreement," but simply to "terms and conditions" (which are not specified or otherwise identified).

Nor is the Deposit Account Agreement a agreement authorizing telephonic voice instructions to make transfers, as it refers only to a customer entering into a Wire Transfer Agreement, which First National appears to have conceded that the Edwardses did not do, and in any event, as noted above, an agreement to enter into an agreement is not enforceable.

Finally, there is no evidence that First National established an "instruction verification procedure other than voice recognition" with the Edwardses. The Bank's Operations Manual containing the purported "Security Procedures" fails to meet the Bond's requirement of an "established" instruction verification procedure between the Bank and the Edwardses, as the Bank has conceded in discovery that it never gave the Edwardses a copy of the Security Procedures, and in any event, an agreement to comply with Security Procedures does not constitute an agreement by the Edwardses authorizing the Bank to

rely on voice-initiated transfer instructions.

## CONCLUSION

In accordance with the foregoing, plaintiff's motion for partial summary judgment is DENIED, and defendant's motion is GRANTED.  Defendant's objections to evidence and motion to strike are DENIED.

**IT IS SO ORDERED.**

Dated:  January 3, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge